IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEPHEN C. GRATZ             )
                                           )
        Plaintiff,            )
                                           )
v.                                       )        Case No. 3:18cv-645-REP
                                         )
                                         )        **TRIAL BY JURY**
DIANE GRATZ a/k/a        )        **IS DEMANDED**
       DIANA GRATZ        )
                                         )
        Defendant.         )
                                           )

# AMENDED COMPLAINT

Plaintiff, Stephen C. Gratz ("Steve"), by counsel, pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, files the following Amended Complaint against defendant, Diane Gratz a/k/a Diana Gratz ("Diane").

Steve seeks compensatory damages, treble damages and punitive damages in a sum not less than **$7,850,000.00**, plus prejudgment interest on the principal sum awarded by the Jury pursuant to § 8.01-382 of the Virginia Code (1950), as amended (the "Code"), attorney's fees pursuant to § 18.2-500 of the Code, and costs incurred – arising out of defendant's tortious interference with contract and business expectancy and civil conspiracy.

As and for his Amended Complaint, Steve states the following facts:

## Parties

1.      Steve is a citizen of Virginia.  He lives in Charlottesville, Virginia.  His father is George Otto Gratz ("George").  His mother was Virginia Lee Gratz ("Virginia"). Virginia died in 2003.

2.      Diane is a citizen of Florida.  After Virginia died, George married Diane. Diane and George own property in the City of Richmond, which they use as an office and residence.  Richmond, Virginia, is their second home.  This case involves Diane's intentional efforts between 2008 and 2014 to interfere with the written and unwritten contracts between Steve and George.  In furtherance of the scheme to injure Steve's property and contractual rights, Diane has been physically present in Virginia on numerous occasions; Diane has had numerous communications with George over the last ten (10) years while George has been physically present in Virginia; George has been physically present in Richmond at least six (6) times a year in connection with the properties and business at issue; and Diane has actively participated in the renovation and repair of the properties at issue, including 509 N. Meadow Street, Richmond Virginia, allowing George to use her personal property (car and architect's drafting table) located in Richmond, Virginia, and her interior decorator's license and companies (Evans Gratz Designs) to make discounted purchases for building materials and furnishings in the Commonwealth of Virginia.  In addition to her contacts related to Steve's claims, Diane has owned multiple parcels of real estate in Richmond over the years, which she has renovated and sold for an enormous profit.  Between August 2012 and the present, Diane has been Director of the Elizabeth Evans Gallery with a place of business in Richmond, Virginia. [https://www.linkedin.com/in/diana-gratz-42952630/].

**Jurisdiction and Venue**

3.     The United States District Court for the Eastern District of Virginia has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

4.     Diane is subject to personal jurisdiction in the Commonwealth of Virginia pursuant to the long-arm statute, § 8.01-328.1(A)(1), (A)(3) and (A)(4) of the Code, as well as the Due Process Clause of the United States Constitution.  She owns real property in Richmond, Virginia, keeps personal property in Richmond, Virginia, and has continuous and systematic contacts with the Commonwealth, such that it is her second home.  She, directly or by an agent, transacted and transacts business in Richmond, Virginia, relating to the properties at issue.  She, directly or by an agent, committed multiple intentional torts and other wrongful acts in the Commonwealth of Virginia, designed to induce George to breach his agreements with Steve.  She caused tortious injury to Steve by acts outside the Commonwealth.  She regularly does business, engages in a persistent course of conduct, and derives substantial revenue from goods used or consumed or services rendered in the Commonwealth of Virginia.   Diane has minimum contacts with Virginia such that the exercise of personal jurisdiction over her comports with traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the United States Constitution.

5.     Venue is proper in the Richmond Division of the United States District Court for the Eastern District of Virginia.   The properties at issue are located in Richmond, Virginia.  Plaintiff's injuries were sustained in Virginia.  A substantial part of

the events or omissions giving rise to the claims stated in this action occurred in the Eastern District of Virginia within the Richmond Division.

**Statement of the Facts**

6.     Virginia invested in residential real estate, and, before her death, acquired a substantial number of apartment buildings and rental units.  In 1994, she formed "Virginia Lee Properties, Inc." ("VLP") to manage the real estate.  Steve was appointed President of the Company.  Steve handled the day-to-day operations of VLP, including management of all the properties.  Between 1994 and 2003, VLP paid Steve a small salary as follows: 1994: 22,000; 1995: 25,000; 1996: 30,000; 1997: 33,000; 1998: 35,000; 1999: 38,000; 2000: 45,000; 2001: 56,000; 2002: 71,000; and 2003: 88,000.  As additional compensation, Virginia agreed to gift distributions to Steve as VLP's operations matured.  At the time of her death in 2003, Virginia held title to over 100 units and Steve and George owned an additional 25 units.  The entire portfolio was approximately 130 units.  The total market value of the properties at the time was estimated at $10,500,000.00.

7.     After Virginia died, George transferred title to the apartment buildings from Virginia's name into the names of single-asset limited liability companies, so that each property was its own LLC.

8.     George informed Steve that he (George) had an unwritten agreement with Virginia that "you [Steve] will be left the apartment buildings when I [George] die." George represented to Steve that he intended to honor his agreement with Virginia of which Steve was the intended beneficiary.

9.     Throughout the years after Virginia's death, Steve and George entered into many additional written and unwritten agreements relating to the apartment buildings.

10.     In 2004, George married Diane.  George and Diane moved to Naples, Florida, into George and Virginia's former marital residence, the home Steve grew up in. At all times relevant to this action, Diane had knowledge of Steve and George's agreements relating to the apartment buildings through her conversations with George and her knowledge of his business.

11.     VLP merged into "Virginia Lee Properties, LLC" ("VLP LLC").  Steve was sole member and manager of VLP LLC.

12.     In 2004, VLP LLC entered into ten-year written agreements to manage the apartment buildings.  Each management contract (one for each building) automatically renewed for another five (5) years unless terminated by the parties 180 days before expiration of the 10-year term.

13.     In their conduct of the apartment building business, George and Steve, at George's request, routinely disregarded corporate formalities and completely disregarded the written management contracts.  They operated the apartment building business as partners, each with a 50/50 vote.

14.     To maximize cash flow to George while George was alive, Steve and George agreed that Steve would take a reduced salary for managing the properties.  In the event any of the apartment buildings were sold, and the proceeds not reinvested in either a 1031 like-kind exchange property managed by Steve or another mutually agreed investment, George agreed to pay Steve 25% of the sales price of the property so sold.

15.     Between 2004 and 2014, Steve successfully managed the apartment building business and properties pursuant to and in reliance upon his agreements with George.

16.     The discussions and agreements between Steve and George regarding the apartment properties were memorialized in an email that Steve sent to George:

-------------- Original message --------------
From: Steve Gratz <stevegratz@verizon.net>

> Hi Dad,
> I wanted to remind you to talk to Mark Robinson about our discussion
> involving the sale of any buildings with the business.
>
> 1. The sale of any building will require an equal vote by you and
> myself only. That we must agree mutually to sell a building.
>
> 2. Any sale in which the proceeds are not reinvested into the
> business by a 1031 or a mutually agreed on investment will allow a
> 25% entitlement to all proceeds from a sale.
>
> 3. In the event that something could happen to you to to impair your
> judgement so you are not able to make your own decisions I would like
> to be entitled to run the business without interference from any
> party. This would not change you r entitlement to the income from the
> business.
>
> As discussed my concern is that we have an operating agreement which
> protects my interest in the business in the event that something
> should happen to you (sorry, not to be depressing). I believe this
> is fair because it does not diminish your equity or entitlement to
> income from the business. Obviously the circumstances are different
> now that Mom is not involved.
>

From conversations with George, Diane was well aware of George's agreement with Virginia and George's agreements with Steve.  Diane also received a faxed copy of the notes of Steve and George's conversations.

17.     At some point between 2005-2007, George told Steve that he wanted to sell some of the run-down apartment inventory and invest the proceeds in newer commercial properties, less student apartments and properties outside of Richmond, Virginia.  Steve was fine with that idea since the buildings had major amounts of deferred

maintenance. Steve and George sold 56 apartment units. They reinvested some of the proceeds in rental properties that they decided to hold in partnership: 1118 Grove Avenue – 50/50; and 203 N. Lombardy Street – 70/30. Steve managed these properties. George used some of the proceeds to purchase and renovate a 2nd home for himself and Diane in Sharon, Connecticut. Finally, some of the proceeds were "loaned" to Steve. Steve used the "loan" proceeds to perform commercial upgrades to the N. Lombardy property (owned by Steve and George 70/30) and construction work on other projects.

18.      Steve continued to work tirelessly to manage the apartment building properties in reliance on his Dad's word and agreements.

19.      Between 2006 and 2008, George and Diane purchased and renovated a 2nd home in Sharon, Connecticut. They purchased the home in July 2006 for $2.6 Million. The home was approximately 6,200 square feet. After purchasing the home, Diane hired a high-end architectural firm. The home was completely gutted. The renovation project went overbudget by at least $1 Million Dollars. After the real estate market in Connecticut crashed, the property quickly went under water. With the massive added debt and diminished cash flow from the renovations, Diane began to express concerns over cash flow and her standard of living. George relayed these concerns to Steve. The Sharon Connecticut property was originally listed for sale in 2012 for $7 Million Dollars. George dropped the price each year by $1 Million Dollars. The property eventually sold in 2016 for $3.1 Million.

20.      Diane's spendthrift habits and her desire to maintain a lifestyle eventually caused Diane to induce George to terminate his agreements with Steve.

21.     In or about March 2007, as the renovations to the Sharon Connecticut property began to ramp up, Steve and George had a discussion in Naples, Florida, about the apartment buildings staying with Steve if anything should happen to George.  George guaranteed to Steve that his marriage to Diane would not interfere with the business and could not because of what he (George) and Virginia had agreed upon.  George told Steve not to worry.  George reiterated that he and Virginia had an agreement that the apartment buildings would stay with Steve.  This included the "Marco office plaza".  George said he was leaving the Naples house to Diane and she had agreed that she would leave it to the Gratz family at her death.  George further stated that Diane had a trust from her last marriage and was set financially.  [In 2013, Steve would be told by George that Diane did not have any money from her prior marriage and George needed to make sure she was taken care of financially].

22.     In March 2008, George and Diane traveled to Richmond, Virginia, just after the birth of Steve's daughter.  Diane told George that she "wanted to see all the apartment buildings".  George took Diane on a tour of the interior and exterior of each building.  Steve thought this was odd, but did not give it much thought.

23.     In May 2008, Steve asked to have lunch with George.  The purpose of the lunch was to discuss the preparation of written agreements to memorialize the unwritten contracts between George and Virginia and the contracts between Steve and George.  Steve's request for a meeting was prompted by a conversation that Steve's (then) wife, Lainie, had had with her grandmother.  Lainie received a call from her grandmother, saying that Diane had stated that she and George were "taking over" the apartment operation.  Diane falsely stated that "they" were taking over management of the rental

properties because of Steve's poor management and "incompetence".  In truth, except for brief turnovers, VLP LLC never had a year in which there was less than 100% occupancy.  Steve asked George whether Diane's statements were true.  George said there was no truth to it.  George confirmed the long-term goal and agreement to hold the apartment properties until his death, at which time the properties would transfer to Steve. There was no need for written contracts.  In February 2011, George repeated to Steve via email:

> Pay no attention to Mary Catherine and the taking over nonsense that got started ---- nothing to it

24.    Just after Steve finished developing the 203 N. Lombardy property, George called Steve and stated that he "could not be prouder" of Steve "as a father." George told Steve that Steve had "done a great job executing every project and taking care of the apartments."

25.    Contrary to George's belief, Diane was, in fact, intent on taking over management of the apartment rental business.  In addition to Lainie's grandmother, Steve has discovered that Diane also made false and defamatory statements about Steve to Diane's sister, Ty.  The purpose of Diane's statements was to drive a wedge between George and Steve.

26.    Diane's intentional interference with Steve and George's contracts occurred over many years.  Ultimately, in or about 2013, Diane finally succeeded in causing George to cut all ties with Steve.  Between 2008 and 2013, Diane had many conversations with George while he was in Virginia in which she induced George to terminate his relationships with Steve.

27.     Diane stopped coming to Richmond regularly after 2010.  The last time Steve saw Diane in Richmond was in 2011.  Steve does not know the number of times Diane has been physically present in the Commonwealth of Virginia since 2011, but, upon information and belief, it has been numerous times to deal with her real estate in Richmond (3122 Windmoor Court), business with George and other matters.  Diane's contacts with the Commonwealth of Virginia, including her involvement in the renovation an repair of the apartment units, were continuous and systematic.

28.     The relationship between Steve and George gradually hardened between 2010 and 2013.  George stopped coming by to see his grandchildren or Steve's spouse, which was completely out of character and contrary to the relationship he had at the time his grandchildren were born.  Steve and his family were not invited to any holiday events and no invitations to visit were accepted by George.  In October 2012, Steve told George at lunch that "we hardly see you".  George was in town to have an early 100th birthday for his mother (Steve's grandmother).  The birthday party was being celebrated early because Diane had decided to open a gallery on or about grandmother's 100th birthday.  Steve said, "Dad, I don't want to interfere with your marriage, but everyone is thinking this is getting weird.  Specifically, that you and Diane are not going to be here for Omi's birthday."  George sternly replied, "that's right, you're not going to interfere."  George was out of character and agitated.  Steve asked him to explain what was going on. George admitted that "Diane feels you are against her and trying to undermine our relationship.  She feels threatened and it's causing alot of stress between us."  In another conversation, George revealed to Steve that Diane had commented that Lainie's family was filled with mental illness and instability.  Diane made these statements to make Steve

and Lainie's children appear as if they would be future liabilities to George.  Diane also trolled Lainie's Facebook and got George to relay concerns to Steve that Lainie was trying to take credit for Steve's success and ownership of N. Lombardy.  Diane told George that Lainie was running around with all sorts of questionable people.  This created panic in George about Steve's marriage, about Steve's lineage, and caused George to question whether to leave any property to Steve.

29.     Between 2009 and 2013, Steve was not paid any management fees.  Steve agreed to forgo his management fees because George said that he and Diane were "pinched" financially and needed all the cash flow from the apartment buildings.  Steve cooperated with George for years because of George's agreement that the apartment buildings would transfer to Steve upon George's death.  Steve was willing to manage the apartment buildings and was content to receive the "equity" in the properties.

30.     By February 2013, George was getting alot of pressure from Diane about getting "them" out from under the $1.8 Million Dollar note that was tied to the Sharon Connecticut house.  Diane presented George with an ultimatum:  choose between her (Diane) or Steve.  George asked Steve to dissolve the partnerships that owned 1118 Grove Avenue and 203 N. Lombardy Street and to "trade" the Grove Avenue property for the North Lombardy property.  It was a horrible proposition.  Steve asked George to confirm his long-term plan for the equity in the apartment buildings and why this "trade" was so important.  Contrary to earlier statements, George said he needed "the apartments" to make sure Diane had money to live off.  George admitted that Diane was totally irresponsible with money.  George wanted to create a trust for her.  Steve explained to George how concerned he (Steve) was about George's relationship with

Diane and George's isolation from the family.  Steve confided in George that he (Steve)

felt like he was getting forced out of the apartment business.  Steve asked for a definitive

explanation of everything that was going on.  George was reticent to have a discussion.

He seemed conflicted.  He said, "let me give this some more thought."  He said. "you

don't know how hard *this* is for me to do."  By "this", George meant that he was about to

breach his agreements and cut Steve out of the business.

31.     Steve advised George that he would not agree to the dissolution of the

partnerships and the building swap unless George was willing to put two (2) apartment

buildings in a life estate and confirm in writing the agreed long-term plan for the equity

in the apartment buildings.  Diane instructed George to refuse Steve's proposal and to

terminate all contracts, written and unwritten, relating to the rental properties.  When

George returned to Virginia from being with Diane in Florida, George informed Steve

that he was "not doing it", meaning he would not put any properties in a life estate or

confirm that the apartments would convey to Steve upon George's death.  George advised

Steve that the apartment business was no longer a family operation.  "Plans change," he

said.  George demanded that Steve repay two promissory notes, including a $700,000

note for the renovations of 203 N. Lombardy Street.

32.     In October 2013, George engaged legal counsel in Virginia.

33.     At this point, Steve felt compelled to investigate Diane's past relationships

to see if Diane had engaged in similar overbearing, sharp and unethical behavior in the

past.  Steve tracked down one of the step children from Diane's last marriage and found

their story to be almost identical: unnecessary isolation from their father, fraudulent

accusations and misrepresentations of character, closed door discussions that he was unfit

to manage the family business, etc.   Steve also learned that Diane had made misrepresentations to George about her past, including false claims about her education. Diane also failed to mention a 2nd marriage.

34.     In or about March 2014, Steve asked George about the debt on the Sharon Connecticut house.  Contrary to his unwritten agreement with Steve, George revealed that he had sold the "Marco office plaza" and, instead of reinvesting the proceeds as agreed with Steve, George used the proceeds to pay off the debt on the Sharon Connecticut property.  Steve reviewed the property records and discovered that Diane was on the note for the Sharon Connecticut house.  The Marco office plaza was part of the unwritten commercial business agreement between Steve and George.  They had planned on clearing the site and building a hotel or selling the property and reinvesting the capital in additional rental properties in Richmond.  George did not pay Steve 25% of the proceeds of the sale of the Marco office plaza.

35.     On March 13, 2014, George unlawfully terminated the written management agreements and purported to terminate Steve's management authority regarding 1118 Grove Avenue.

36.     In communications with George and others between 2014 and 2017, it became crystal clear to Steve, based on the totality of the circumstances, that Diane had sabotaged Steve's relationship with his Dad and that Diane had caused George to renege on his agreement with Virginia and his agreements with Steve.  Diane intended to divide George and Steve and to take control of the apartment building business, and its tremendous cash flow, through defamation, fraud and unethical and sharp practices. Diane planted in George's mind the idea that he (George) and Steve had never been

close.   For instance, George began to adamantly deny having lunch with Steve at Joe's Inn.   In truth, they had lunch together at Joe's Inn in the Fan on a regular basis for about fifteen (15) years.   George kept telling Steve in text and email that Steve had said to him, "you will never see me or your grandchildren again".   Steve never said this.   In truth, because of Diane, George had turned down every offer Steve had made to meet up.   In a text message in 2014, George stated:

> You still are hung up on Diana and she sensed it from day one and I did as well
> You have quite the checkered background so don't call the pot black

The text message was pure fantasy.   It showed the extent to which Diane had manipulated George and interfered with his relationship with Steve.   In an email in 2010, George wrote:

> From: georgegratz@comcast.net
> Subject: Diane
> Date: May 11, 2010 8:51:23 AM EDT
> To: steve c gratz <stevegratz@verizon.net>
> Cc: Lainie Gratz     <lainiegratz@gmail.com>
>
> Hi Steve & Lainie -- I cann't tell you how much Diane appreciated your " Have a nice Mothers Day "  Lainie and you have been very thoughtful toward Diane on many occasions and I have been remise not to tell you how much the warmth from you both is appreciated by Me.
>
> Thanks Again
> George

In truth, Steve was excited for his Dad to get remarried. George was devastated by the loss of Virginia. The fact that George abandoned Steve for Diane was also obvious to family friends. Steve was at a wedding in Naples and ran into Bonnie Lynch, who was one of his parents' closest friends for thirty (30) years. Bonnie asked how George was doing. Steve explained that their relationship had become estranged without going into detail. Bonnie said that she and her husband had seen George in the airport several years ago and he acted as if he hardly knew them. Bonnie said no one in Naples sees George. Bonnie relayed that she had reached out to George in 2015 in an email. Bonnie informed George that he should heal the relationship between he and Steve – that he would need Steve later in life. George's response was that Diane would be the only one looking after George. In addition, whereas George had described Diane's son, Jim Hedges, as "Junior Bernie Madoff" and said he would never have anything to do with Hedges, Steve received a Facebook photograph of George at a birthday party in 2017 in Aspen with Hedges and Hedges' youngest son. Diane's influence upon George and her motive for getting him to terminate his business and personal relationships with Steve is also manifested in the comments of George's bookkeeper, Alice Young, who referred to the "unbelievable" checks she (Alice) had written to Hedges. This solidified Steve's view that Diane had caused George to terminate all contracts with Steve because Diane wanted control of all the cash and/or to conceal payments made to her son or for his benefit. Finally, Steve asked his mother-in-law, Ann Hedges, who has known Diane her whole life, to reach out to Diane at Christmas 2016, to see if Diane would help getting the family back together, so George could know his grandchildren. Diane responded that "they" would not be having a relationship with Steve or the grandchildren. Ann asked

Diane what in the world could have caused this estrangement between George and Steve. Diane responded that George did not cause it.   She said she thought of a "gif" that explains why:



Diane's gif image is bizarre and immoral.  Steve managed the apartment buildings for 20 years without a single complaint.  He agreed to a reduced salary, so Diane and George would experience no financial hardship.  He agreed to work for free for as long as needed.  Steve lost his two (2) brothers in a house fire at age ten, which Diane is aware of.  George and Virginia were married for nearly fifty years.  Virginia died unexpectedly at age 69.  George is the only family Steve has left.  Steve never slept on the proverbial couch while life passed him by.

37.     In April 2014, George admitted to Steve that he needed to make sure that Diane was taken care of.

38.     But for Diane's intentional interference with Steve's contracts with George and George's unwritten contract with Virginia, Steve would have been paid a management fee, 25% of the sale price of any property sold, and would have been entitled to the equity in the apartment buildings at George's death.

39.     Currently, upon information and belief, there are eighty-nine (89) apartment units with an estimated fair market value of $10.5 Million and a net cash flow per year of approximately $500,000.

40.     Since 2014, George has been physically present in Virginia at least six (6) times per year dealing with the properties that are at issue.  After Steve's grandmother passed in 2015, Diane and George used the property on Windmoor Court that she lived in as a business office and residence.  Diane kept/keeps her car and furniture there.  Since 2015, Diane has continued to own real and personal property in the Commonwealth of Virginia, and to actively assist George in the management and operation of the apartments in the Commonwealth that were the subjected to George and Steve's agreements.

## COUNT I – TORTIOUS INTERFERENCE WITH CONTRACT

41.     Steve restates paragraphs 1 through 40 of this Amended Complaint and incorporates them herein by reference.

42.     Steve had valid contracts and business expectancies, including his interest as a third-party beneficiary of the agreement between George and Virginia and his contracts with George.

43.     Diane knew about Steve's rights and business expectancies.

44.     Diane intentionally interfered with Steve's property rights and business expectancies by, *inter alia*, (a) engaging in repeated acts of defamation and insulting words, (b) lying to George to cause him to mistrust Steve, and (c) advising George to breach his written and unwritten contracts with Steve.  Diane's actions and practices were and are illegal, independently actionable, unethical, oppressive, over-reaching,

fraudulent, hostile, and sharp.  In 2014, because of Diane's actions, George terminated his agreement with Virginia and his agreements with Steve.

45.     As a direct result of Diane's tortious interference, Steve suffered damage and incurred loss, including, but not limited to, loss of business, income and property, damage to his reputation, attorney's fees, court costs, and other out-of-pocket expenses and damages in an amount to be determined by the Jury, but not less than $2,500,000.00.

### COUNT II – BUSINESS CONSPIRACY

46.     Steve restates paragraphs 1 through 45 of this Amended Complaint and incorporates them herein by reference.

47.     Beginning in 2008 and continuing through 2014, Diane combined, associated, agreed or acted in concert with George for the express purposes of injuring Steve in his business of apartment ownership, management and operations.   In furtherance of the conspiracy and preconceived plan, Diane and George engaged in a joint scheme the unlawful purpose of which was to tortiously interfere with and cause the termination of the written and unwritten agreements at issue in this action.

48.     Diane acted intentionally, purposefully, without lawful justification, and with the express knowledge that she was interfering with Steve's ownership, management and operation of the apartments.

49.     Diane's actions constitute a conspiracy in violation of § 18.2-499 of the Code.

50.     As a direct result of Diane's willful misconduct, Steve suffered damage and incurred loss, including, but not limited to, injury to his business and professional

reputation, attorney's fees, court costs, and other damages in an amount to be determined by the Jury, but not less than $2,500,000.00.

51.     In accordance with § 18.2-500 of the Code, Steve seeks three-fold the damages by him sustained in a sum to be determined by the Jury, but not less than $7,500,000.00.

### COUNT III – COMMON LAW CONSPIRACY

52.     Steve restates paragraphs 1 through 51 of this Amended Complaint and incorporates them herein by reference.

53.     Diane's actions, detailed above, constitute a conspiracy at common law.

54.     As a direct result of Diane's willful misconduct, Steve suffered damage and incurred loss, including, but not limited to, injury to his business and reputation, financial loss and loss of profits, court costs, and other damages in an amount to be determined by the Jury, but not less than $2,500,000.00.


Steve alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession.  He believes that substantial additional evidentiary support, which is in the exclusive possession of Diane and her agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Steve reserves his right to amend this Complaint upon discovery of additional instances of Diane's wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Plaintiff, Stephen C. Gratz, respectfully requests the Court to enter Judgment against Defendant, Diane Gratz, as follows:

A.      Compensatory damages in the sum of $2,500,000.00 or such greater amount as is determined by the Jury;

B.      Three-fold damages in the sum of $7,500,000.00;

C.      Punitive damages in the amount of $350,000 or the maximum amount allowed by law;

D.      Prejudgment interest from March 13, 2014 until Judgment is entered at the rate of six percent (6%) per annum;

E.      Postjudgment interest at the rate of six percent (6%) per annum until paid;

F.      Costs;

G.      Such other relief as is just and proper.

## TRIAL BY JURY IS DEMANDED

DATED:      January 22, 2019

STEPHEN C. GRATZ

By:___*/s/ Steven S. Biss*_____
                Steven S. Biss (VSB # 32972)
                300 West Main Street, Suite 102
                Charlottesville, Virginia 22903
                Telephone:     (804) 501-8272
                Facsimile:     (202) 318-4098
                Email:         **stevenbiss@earthlink.net**

                *Counsel for the Plaintiff*

20

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2019 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendant and all interested parties receiving notices via CM/ECF.

By:   */s/Steven S. Biss*
       Steven S. Biss (VSB # 32972)
       300 West Main Street, Suite 102
       Charlottesville, Virginia 22903
       Telephone:   (804) 501-8272
       Facsimile:   (202) 318-4098
       Email:         **stevenbiss@earthlink.net**

       *Counsel for the Plaintiff*